UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JENNIFER MEAGHER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 13-11307-JGD |
| ANDOVER SCHOOL COMMITTEE, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF DECISION AND ORDER
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

March 31, 2015

DEIN, U.S.M.J.

## I.  INTRODUCTION

This case arises out of the September 2012 termination of the plaintiff, Jennifer

Meagher ("Meagher"), from her employment as a tenured teacher at Andover High

School ("AHS") in Andover, Massachusetts.  During the time period leading up to the

plaintiff's termination, Meagher and other members of the teachers' union, the Andover

Education Association ("AEA" or "Union"), were involved in contentious negotiations

with the Andover School Committee over a new collective bargaining agreement.  In

addition, AHS was engaged in the process of seeking re-accreditation pursuant to the

standards established by the New England Association of Schools and Colleges

("NEASC"), the accrediting body for public schools in Massachusetts.  The accreditation

process centered on a self-study, which required teachers and administrators at AHS to

conduct evaluations of the school's programs, prepare separate reports addressing one of seven accreditation standards, and present the reports to the faculty for approval. Under the NEASC guidelines, each report required approval by a two-thirds majority vote of the faculty. It is undisputed that Meagher was discharged from employment, effective September 17, 2012, because she sent an email to approximately sixty other teachers in which she urged them to enter an "abstain" vote on the ballots for each of the self-study reports as a means of putting the accreditation process on hold and using it to gain leverage in the collective bargaining negotiations. In this action, Meagher alleges that the decision to terminate her for writing and distributing the email to her colleagues constituted unlawful retaliation for, and otherwise interfered with, the exercise of her First Amendment right to engage in free speech. By her Second Amended Complaint, Meagher has asserted claims against the Andover School Committee (the "ASC" or "Committee"), the Andover School Department and the Superintendent of the Andover Public Schools, Marinel McGrath ("McGrath"), for violations of her rights under 42 U.S.C. § 1983 ("Section 1983") and the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, §§ 11H and 11I ("MCRA").

The matter is presently before the court on the "Plaintiff's Motion for Entry of Order Granting Her Partial Summary Judgment as it Relates to Defendants' Liability" (Docket No. 116). It is also before the court on the "Defendants' Motion for Summary Judgment" (Docket No. 122). By their motions, each of the parties is seeking summary

judgment, pursuant to Fed. R. Civ. P. 56, on Meagher's claims under both Section 1983 and the MCRA.

The fundamental issue raised by the parties' motions is whether Meagher's email to her colleagues is entitled to protection under the First Amendment. Pursuant to the seminal Supreme Court case, <u>Garcetti v. Ceballos</u>, 547 U.S. 410, 418, 126 S. Ct. 1951, 1958, 164 L. Ed. 2d 689 (2006), her speech would be protected if she were speaking as a citizen on a matter of public concern rather than pursuant to her duties as a teacher when she distributed the communication, and if the value of her speech was not outweighed by the defendants' interest in preventing unnecessary disruptions to the efficient operation of the Andover public schools. For all the reasons described below, the court finds that this issue must be resolved in Meagher's favor. Therefore, this court concludes that the plaintiff was deprived of her constitutional rights.

Notwithstanding this court's conclusion that Meagher was unlawfully dismissed from her employment in retaliation for protected speech, this court also finds that McGrath is immune from liability under the doctrine of qualified immunity, and that the plaintiff has failed to establish a triable issue with respect to her claims under the MCRA. Accordingly, both of the parties' motions for summary judgment are ALLOWED IN PART and DENIED IN PART. Summary judgment will be entered for Meagher with respect to her Section 1983 claims against the ASC and the Andover School Department. Summary judgment will be entered for the defendants on all of Meagher's remaining claims.

## II. **STATEMENT OF FACTS**[1]

### **Scope of the Record**

In connection with the pending motions, the parties have filed statements of material facts, pursuant to Local Rule 56.1, containing more than three hundred para-graphs of asserted facts. In addition, the plaintiff has disputed most of the defendants' facts, at least to some extent, or has objected to the defendants' characterization of the evidence. Notwithstanding the nature and volume of the factual record, this court finds that the essential facts are, for the most part, not in dispute, and that the manner in which the evidence has been presented needlessly complicates the case. Consequently, while this court has carefully considered the entire record, it has not attempted to describe all of the facts asserted by the parties or to provide details of all of the issues in dispute. The following Statement of Facts reflects this court's effort to focus on the facts necessary to

---

[1] Unless otherwise indicated, the facts are derived from: (1) the plaintiff's Statement of Material Facts Concerning Plaintiff's Motion for Partial Summary Judgment on the Issue of Liability ("PF") (Docket No. 116-1); (2) the Affidavit of Jennifer Meagher ("Meagher Aff.") (Docket No. 116-3) and the exhibits numbered 5-12 thereto ("Pl. Ex. __"); (3) the Defendants' Concise Statement of Undisputed Material Facts in Support of Summary Judgment ("DF") (Docket No. 124) and the exhibits attached thereto ("Def. Ex. __"); (4) the Defendants' Response to Plaintiff's Statement of Material Facts Concerning Plaintiff's Motion for Partial Summary Judgment on the Issue of Liability ("DR") (Docket No. 131); (5) the Facts from Defendants' "Statement of Undisputed Material Facts in Support of Summary Judgment" Which Plaintiff Disputes Wholly or in Some Part ("PR") (Docket No. 132-2); (6) the Affidavit of Jennifer Meagher in Opposition to Defendants' Motion for Summary Judgment ("Meagher Opp. Aff.") (Docket No. 132-3); (7) exhibits 5 through 14 attached to the Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Pl. Supp. Ex. __") (Docket No. 132); and (8) the Supplemental Affidavit of Jennifer Meagher ("Supp. Meagher Aff.") attached to Meagher's Reply Memorandum of Law in Support of Her Motion for Partial Summary Judgment (Docket No. 134).

describe the critical issues in this case, including those that are and are not genuinely in dispute, and which are necessary to understand this court's rulings on the parties' motions for summary judgment.

## The Parties

The plaintiff, Meagher, became employed at AHS in December 2001.  (PF ¶ 13).  At all times relevant to the present action, Meagher worked as a tenured teacher in the high school's English Department.  (Id. ¶¶ 13-14).  Meagher consistently received positive work performance evaluations throughout her employment at AHS.  (Id. ¶ 15).  In fact, as late as May 2011, Meagher was evaluated as having exceeded the requirements of her job, and was commended for her demonstrated commitment to the Andover public schools.  (Id.).

In addition to her work as an English teacher, Meagher became an active member of the Andover teacher's union, the AEA.  (See id. ¶¶ 13, 16).  For example, in November 2010, Meagher was elected as an AEA Building Representative.  (Id. ¶ 17).  She later became Chair of the AEA's Action Committee, and was elected Vice President of the Union in June 2011.  (Id. ¶¶ 18-19, 21).  As Vice President, Meagher obtained a position on the AEA's bargaining committee, and was directly involved in negotiations over the collective bargaining agreement ("CBA") between the Union and the ASC.  (Id. ¶¶ 21, 33; DF ¶ 11).  As described below, those negotiations helped fuel the events that ultimately led to Meagher's termination from her job at AHS.

The defendants, ASC and the Andover School Department, are municipal entities, which were responsible for the operation of AHS and served as the plaintiff's employer throughout the time she worked at the high school. (PF ¶¶ 2, 4). At all relevant times, defendant McGrath was the Superintendent of the Andover Public School System. (Id. ¶ 3; DF ¶ 3). As part of her job as Superintendent, McGrath was responsible for over-seeing operations at AHS. (PF ¶ 4). She was also responsible for supervising and evaluating all public school personnel, and for the hiring and firing of teachers. (Def. Ex. C at 6-9). As described below, McGrath made and carried out the decision to dismiss Meagher from her employment as a tenured teacher at AHS. In this action, McGrath has been named as a defendant in her individual capacity.

## The Dispute Over the CBA

In August 2010, the CBA between the ASC and the AEA expired, and those parties entered into negotiations over the terms of a new contract, which continued throughout both the 2010/2011 and the 2011/2012 school years. (DF ¶ 4; PR ¶ 4). From the beginning, bargaining over the terms of a successor agreement was highly contentious due mainly to a disagreement over the School Committee's proposal to increase the teaching schedule at AHS from five to six courses per year. (PF ¶ 28; DF ¶ 5). Under the proposal, teaching staff at AHS would experience a 20 percent increase in teaching time, and the defendants would be able to cut as much as 20 percent of the high school faculty. (DF ¶ 5; PF ¶¶ 29-30). In addition, the Union believed that the proposal would result in a

reduction of teacher planning time, while simultaneously increasing workload and class size.  (PF ¶ 33; DR ¶ 33).

The proposal was received negatively by teachers at AHS and by various members of the AEA.  (See PF ¶¶ 32-33; DR ¶ 33; Meagher Aff. ¶ 7).  It was also the subject of considerable discussion in the Andover community, and in the local media.  (PF ¶ 34).  For example, the negotiations between the AEA and the ASC were discussed at various School Committee meetings.  (Meagher Aff. ¶ 8).  They were also discussed in articles and submissions that appeared in the local newspaper.  (Id.).  In early 2011, after an attempt to mediate the dispute proved unsuccessful, the matter was submitted to an arbitrator for purposes of conducting a fact-finding hearing.  (PF ¶ 35; see also PF ¶ 168).  However, the arbitrator's report was not issued until June 2012, and the parties remained at an impasse in the meantime.  (See id. ¶¶ 35, 168).

While the negotiations were ongoing, Meagher engaged in a variety of activities on behalf of the AEA.  For example, but without limitation, she spearheaded a campaign, known as the "Love Your Teachers" campaign, which was designed to support the Union's positions in its negotiations with the ASC.  (DF ¶ 7; PR ¶ 7).  She was also a leading spokesperson and  key organizer for the Union at School Committee meetings.  (PF ¶ 38).[2]  After Meagher was elected Vice President of the AEA in the spring of 2011,

_____

[2]  The defendants have objected to various facts asserted by the plaintiff in her Statement of Material Facts, including the facts set forth in paragraph 38, because they rely solely on a decision issued by the Commonwealth Employment Relations Board ("CERB"), and this court previously declined to find the CERB decision binding upon the parties in this action based on

and became a member of the Union's bargaining team, she participated in the negotiations over a new CBA. (DF ¶ 11). In addition, she continued to play a leading role in demonstrations and other activities that were aimed at promoting the Union's views to the public and advancing its goals in the negotiations. (See PF ¶¶ 39, 41-48, 55-56). The record indicates that Meagher's conduct on behalf of the Union was provocative, and that she antagonized the Superintendent, as well as the high school administration, in the course of carrying out her union-related activities. (See PF ¶¶ 45-54, 57-65).

Meagher often worked from home during non-school hours when she engaged in activities on behalf of the AEA. (DF ¶ 9; PR ¶ 9). She also relied on her personal email account to communicate with others about such activities, and often contacted Andover teachers using their personal email addresses. (Id.). By the summer of 2011, Meagher had created a database that contained approximately 150 personal email addresses

principles of collateral estoppel. (See, e.g., DR ¶ 38). However, this court finds that the defendants' objection is insufficient to bar the plaintiff's use of the facts contained in the CERB decision or to create a genuine dispute with respect to the asserted facts. While this court ruled that collateral estoppel did not bar the defendants from relitigating issues that were addressed by the CERB, nothing in this court's prior order precludes the plaintiff from relying on relevant aspects of the CERB's findings as evidence in this case. See Davignon v. Hodgson, 524 F.3d 91, 112-13 (1st Cir. 2008) (finding that decision rendered by Massachusetts Labor Relations Commission was admissible under public records exception to the hearsay rule). The defendants have not presented any evidentiary basis for excluding those findings. Nor have they cited any evidence that disputes or otherwise undermines the findings on which Meagher has relied. Consequently, this court finds that facts asserted by the plaintiff, which rely on the CERB's decision, must be deemed admitted for purposes of the parties' cross-motions for summary judgment. See L.R. 56.1 (requiring party opposing summary judgment to "include a concise statement of material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation," and explaining that material facts asserted by moving party "will be deemed ... to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties").

belonging to members of Andover's teaching staff.  (DF ¶ 10; PR ¶ 10).  The database contained none of the staff members' professional, work-related contact information. (Id.).

## The Re-Accreditation Process

At the same time as negotiations over the CBA were occurring, AHS was engaged in the process of seeking re-accreditation pursuant to the standards established by NEASC.  (See DF ¶ 13; PF ¶¶ 68, 71).  The NEASC accreditation process occurs every ten years.  (PF ¶ 70).  AHS was scheduled for an accreditation review by a NEASC Visiting Committee on October 30, 2012.  (PF ¶¶ 70, 94).

In order to obtain NEASC accreditation, a school must undertake a multi-year self-study that proceeds in accordance with written standards, guidelines and timetables established by the NEASC governing body and the Commission on Public Secondary Schools.  (Id. ¶ 71).  As of the spring of 2011, AHS was involved in the self-study part of the re-accreditation process.  (DF ¶ 13).  This required the teachers and administrators at AHS to conduct evaluations of the school's programs, prepare separate reports addressing one of seven accreditation standards, and present the reports to the faculty for approval. (DF ¶¶ 13, 15; PF ¶¶ 75-77).  In order to accomplish these tasks, the school's principal appointed a Steering Committee made up of teachers who had applied for the position. (PF ¶¶ 74, 89).  Faculty members who were not serving on the Steering Committee were required to serve on a self-study committee.  (Id. ¶ 75; DF ¶¶ 15-16).  The self-study committees were responsible for examining one of the seven accreditation standards and

preparing a report of their findings. (DF ¶ 15). Meagher was placed on the curriculum committee for purposes of carrying out the self-study portion of the accreditation process. (DF ¶ 19).

There is no dispute that the teachers were paid to participate in the re-accreditation process, and were given time during working hours to perform the necessary tasks.[3] (See id. ¶ 18; PR ¶ 18). However, they dispute whether the teachers were obligated to do so as part of their job responsibilities. (DF ¶ 17; PR ¶ 17). According to McGrath, teachers at AHS were required to participate in the self-study as part of their contractual obligations. (Def. Ex. C at 43-44). Meagher, on the other hand, insists that the teachers had no such responsibility, and that the existing CBA had expired by the time the re-accreditation process took place. (See PR ¶ 17; Def. Ex. C at 44). This court finds that this issue does not need to be resolved in order to determine liability in this case. Even assuming the teachers were required to participate in the NEASC process as part of their professional obligations, this court would still conclude that the plaintiff was engaged in protected speech when she wrote the email that led to the termination of her employment.

---

[3] Although the plaintiff takes issue with the defendants' assertion that the teachers were paid to participate in the NEASC process, and given time during working hours to carry out such activities, she has not presented any evidence to raise a genuine issue of material fact with respect to those matters. (See PR ¶ 18). Accordingly, this court has accepted the defendants' asserted facts as true for purposes of the pending motions. See LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993) (explaining that party opposing summary judgment must set forth specific facts showing that there is a genuine issue for trial).

Under the NEASC guidelines, each of the self-study reports that is completed as part of the accreditation process must be approved by a two-thirds majority vote of the faculty.  (PF ¶¶ 77, 80).  In the event a report is not approved, it is returned to the appropriate committee for revision to address any concerns and issues raised.  (Id. ¶ 82).  It is then presented to the faculty again for consideration.  (Id.).  After all seven reports have been approved by the faculty, they are compiled and edited by the Steering Committee appointed by the school's principal.  (Id. ¶¶ 74, 84).  The Steering Committee must submit the reports to the NEASC Visiting Committee in advance of its visit to the school.  (Id. ¶ 84).  As described above, the Visiting Committee evaluating AHS' compliance with the applicable accreditation criteria was scheduled to visit the school at the end of October 2012.  (Id. ¶ 94; see also id. ¶ 83).  Therefore, each of the seven self-study reports had to be approved, finalized and submitted to NEASC prior to that time.

### Introduction of an "Abstain" Option
### on the Ballots for the Self-Study Reports

There is no dispute that the failure of the AEA and the ASC to resolve their ongoing dispute over a new CBA had a direct impact on the self-study process and the content of the self-study reports.  For example, the uncertainty about the proposed new schedule caused many teachers to express concern over the impact that the potential changes might have on the programs that were offered at AHS, on the time that teachers would be able to spend with their students, and on the teachers' ability to assist with various extracurricular activities.  (PF ¶¶ 96-97).  It also caused some teachers to express

discomfort with the accuracy of the self-study reports. (See id. ¶ 96). In some instances, language was ultimately added to the final versions of the reports in order to reflect the fact that the reports might not be accurate if the ASC's proposed schedule change became part of the new CBA. (See id. ¶¶ 103-04).

By the spring of 2012, the Union's frustration with the stalled contract negotiations also threatened to derail the NEASC process altogether. Thus, at the end of March 2012, members of the AEA's bargaining team were discussing whether to withhold voting on the NEASC self-study reports. (Id. ¶ 107). By April 6, 2012, the bargaining team had voted unanimously to cease participation in the NEASC process entirely. (See id. ¶ 109). This information was conveyed to the administration at the high school. (Id. ¶¶ 109-110). On about April 9, 2012, the Union was advised that the ASC would consider any failure to participate in the self-study process as an illegal work stoppage, and would discipline any high school teacher who refused to take part in the voting on the self-study reports. (Id. ¶¶ 114-15).

As a result of the controversy over the voting, a proposal was made to use secret paper ballots, and to add an "abstain" option onto the existing ballots as an alternative to a "yes" or "no" vote. (See id. ¶¶ 117-20). The purpose of the "abstain" option was to give teachers an opportunity to register their displeasure with the CBA negotiations even if they did not actually disagree with the substance of the self-study reports. (Def. Ex. D at 23). It would also enable the Steering Committee and others to understand which teachers were voting "no" because they disagreed with a report, and which teachers were

attempting to hold up approval of the reports as a means of gaining leverage for the Union in the collective bargaining process. (DF ¶ 27; PR ¶ 27). There is no dispute that the option to vote "abstain" was developed with the knowledge and approval of Thomas Sharkey ("Sharkey"), the Interim Principal at AHS. (PF ¶¶ 9, 118; DR ¶ 118). Sharkey reported directly to McGrath and worked closely with her on all matters relating to the high school. (PF ¶¶ 9, 11). He also communicated with McGrath on a continuous basis. (Id. ¶ 12).

The Steering Committee adopted the proposed paper ballots containing the three voting options, and the decision was announced to the teaching staff. (Id. ¶¶ 120-21, 127). While the defendants did not explain their view regarding the purpose of the abstain option to the faculty, or provide any type of directive on that matter, the teachers understood that any votes to abstain would be included in the calculation to determine whether a self-study report received the two-thirds majority vote required for approval. (Id. ¶¶ 124-25, 138-39). Similarly, McGrath understood that an "abstain" vote would have the same effect as a "no" vote for purposes of the re-accreditation process. (DF ¶ 29). Nevertheless, it is undisputed that the teachers maintained the right to select any of the three options set forth in the ballots, and could not be dismissed or otherwise disciplined on the basis of their votes on the self-study reports. (PF ¶¶ 129, 140-42; DR ¶¶ 129, 140-42).

From the time the "abstain" option was included on the ballots, votes for absten-tion prevented the passage of nearly every report that was presented to the high school

faculty. (PF ¶ 131). Sharkey was aware, in the spring of 2012, that some of the reports had failed due to the use of the "abstain" option. (Pl. Ex. 9 at 15-16). Similarly, McGrath became concerned that the reports were failing due to the combination of "no" and "abstain" votes, and she drew the conclusion that the contract dispute was responsible for the outcome of the voting process. (Def. Ex. C at 78, 107-09). Still, the "abstain" option remained an acceptable alternative on the ballots for the self-study reports. (See PF ¶ 149).

By early June 2012, Greg Waters ("Waters"), one of the co-chairs of the NEASC Steering Committee at AHS, became concerned that the self-study reports would not pass in time to enable the Committee to finalize them and provide them to the NEASC Visiting Committee in advance of its visit to the school. (Id. ¶ 153). He also became concerned that the tensions created by the contract dispute were making it difficult to gain approval on even the most straightforward reports. (Id. ¶ 154). Accordingly, Waters, Sharkey and McGrath met with NEASC officials to determine when, at the latest, the reports needed to be approved. (Id. ¶ 156). The NEASC officials informed them that approval could occur no later than September 2012, but that this would be "pushing it." (Id. ¶ 157). Subsequently, Waters informed that faculty at AHS that the NEASC reports could be passed at the beginning of September 2012, when school started, without delaying the accreditation review that was scheduled to take place the following month. (Id. ¶¶ 159-61).

At about the same time as these events were taking place, the AEA was holding elections for new officers. (Id. ¶ 165). Meagher ran for president of the Union, but lost the election to the incumbent. (Id. ¶ 166). As described below, however, she continued to engage in Union activities and participate in the collective bargaining process on behalf of the Union.

Another event that occurred in early June 2012 was that the arbitrator who conducted the fact-finding hearing regarding the contract dispute between the AEA and the ASC sent the parties a two-page summary describing her recommendations. (Id. ¶¶ 168-69). The arbitrator recommended that AHS alter its schedule for the 2012-2013 school year, and increase its teacher workload to the level that had been proposed by the ASC. (Id.). A full report describing the basis for the arbitrator's decision was distributed to the parties later that month. (Id. ¶ 168).

<u>Meagher's Email Communication</u>

On June 10, 2012, on the heels of receiving the arbitrator's recommendation, Meagher distributed an email to approximately 60 members of the high school faculty who had been involved in the re-accreditation process. (Id. ¶ 170; DF ¶ 33). Meagher sent the communication during non-school hours using her personal, home email account, and she contacted the recipients using their personal email accounts. (PF ¶ 170; DF ¶ 33). As described below, the decision to terminate Meagher's employment was based on the contents of the email. This court finds that the defendants' actions in response to

Meagher's communication constituted unlawful retaliation for constitutionally protected speech.

The plaintiff's email began with the following statement:

There are 60 people receiving this email.  All of you:

- are members of the AHS faculty
- have a vote on Wed. June 21
- have demonstrated a willingness to support the union and your bargaining team this year in words and actions

(Def. Ex. E at 1).  She then asked the recipients to join her in taking the following  action:

Here's what I'm going to do and what I ask you to do:

- PICKETING next week, every day.  60 people is an impressive picket line.  Admit it, you miss us.
- ABSTAIN on June 21.
- Attend School Committee meeting on June 21 (7PM, Central Office)

(Id. at 1-2).  According to the plaintiff, she was not asking her colleagues to abstain from voting, but rather was asking them to select the "abstain" option on the ballots for the self-study reports.  (See Meagher Aff. ¶ 11; Pl. Ex. 6 at 70).

In her email, Meagher also explained why she was asking her colleagues to participate in the proposed activities.  Specifically, as the plaintiff stated:

This is about last impressions before heading into the summer.  Here's what our actions would accomplish:

- Get parents worried with more demonstrations next week.
- Put a hold on NEASC.

- Make the [School Committee] uncomfortable at their last meeting, nervous that the high school is still fighting and that NEASC is on the line.

  NEASC is the only leverage we have left at the bargaining table. We can assure the [School Committee] and the [Superintendent] that reports will be passed and NEASC will continue if there is a contract signed this summer that maintains a 5-class load at AHS. We need not argue with our colleagues over it. We have enough votes right here on this list to get it done. If, in the end, the [School Committee] decides that saving $500,000 is more important than preserving accreditation, then so be it. At least we will know we've done all that we can.

(Def. Ex. E at 2). Accordingly, it was Meagher's hope that the proposed actions would hold up the high school re-accreditation process so that the Union could gain leverage in the negotiations over a new CBA, and prevent the defendants from implementing an increased teaching schedule.

Finally, Meagher asked that the recipients of her email refrain from undermining the Union's strategy. Thus, as the plaintiff stated in closing:

  If you decide not to participate in this action, please do not undermine it by complaining or criticizing it with people critical of the union. Please do not forward this email to people who will undermine this action. This is how we have shot ourselves in the foot for 2 years. Just let it be and allow it to have whatever impact it is going to have. And if you hear people complaining, remind them that the activists are the only ones standing in the way of 6 classes next year for high school teachers.

  Your high school colleagues on the bargaining team will do all that we can to protect conditions at AHS, but don't send us in empty-handed, PLEASE.

(Id.).

## Events Leading Up to Meagher's Termination

The plaintiff's effort to prevent the dissemination of her email to critics of the Union proved unsuccessful. On June 14, 2012, McGrath received two copies of the email – one from an anonymous source, and another from Sharkey, who had received it from an assistant principal at AHS. (PF ¶¶ 180-81). In addition, the local newspaper obtained information about the email, and published an article describing its contents. (Id. ¶¶ 183-84). Meagher declined the opportunity to comment for the article. (Id. ¶ 183).

While these events were occurring, the ASC and the Union were continuing to negotiate over the terms of a new CBA. (See id. ¶ 189; DF ¶ 49). On June 19, 2012, the parties reached a tentative agreement, which included the School Committee's proposed increase to the teacher workload at AHS. (PF ¶ 189). One day later, on June 20, 2012, the parties reached a final agreement. (DF ¶ 49). The Union subsequently voted to ratify the contract terms that had been offered by the defendants in the negotiations. (PF ¶¶ 196, 216).

On June 21, 2012, the faculty at AHS voted on all of the outstanding self-study reports. (DF ¶ 50). Although McGrath and Sharkey had received Meagher's email a week earlier, they said nothing to influence the voting. (See PF ¶ 197). Nor did they prevent Meagher from participating in the voting process. (Id. ¶ 198). The record establishes that some faculty members voted "no," and others voted "abstain." (Id. ¶ 195). Nevertheless, each of the reports was approved by the necessary two-thirds majority of

the teaching staff.  (See DF ¶ 50).  Therefore, both Meagher's effort to maintain the five

class schedule at the high school, and her effort to stall the NEASC process by urging her

colleagues to "abstain," were defeated.

## **Termination of Meagher's Employment**

Following consultation with counsel, McGrath made the decision to terminate the

plaintiff's employment.  (See DF ¶¶ 42-43; PR ¶¶ 42, 43).  Thus, in a letter dated June

26, 2012, McGrath provided Meagher with notice, pursuant to Mass. Gen. Laws ch. 71,

§ 42,[4] that she was placing Meagher on administrative leave, effective immediately, and

that she intended to dismiss Meagher from her employment as a teacher with the Andover

Public Schools.  (Def. Ex. F).  In her letter, McGrath quoted portions of Meagher's June

10, 2012 email, including the plaintiff's request that her colleagues "'ABSTAIN on June

21' and 'Put a hold on NEASC[,]'" and her statements advocating the use of NEASC as a

means of gaining leverage in the collective bargaining process and maintaining the

existing teacher workload at AHS.  (Id. at 1).  McGrath further explained the basis for her

decision to terminate Meagher's employment as follows:

> As you know, the NEASC activities which are the subject of your
> email, including the referenced "June 21" vote and the referenced
> action on "reports", and which your email urged teachers to
> "abstain" from and to "put a hold on", are required in-service duties
> of those teachers.  Accordingly, your email constitutes a clear
> violation of G.L. c. 150E, § 9A(a), which makes it illegal for a
> "public employee" to "induce, encourage or condone any strike,

---

[4] Mass. Gen. Laws ch. 71, § 42 governs the dismissal or demotion of teachers or other
employees from the Massachusetts public schools.

work stoppage, slowdown, or withholding of services by" public
employees.  As such, your email and your conduct in encouraging
teachers not to perform their in-service duties in an effort to bring
the NEASC accreditation work to a halt and jeopardize the
accreditation of Andover High School constitutes "conduct
unbecoming a teacher", "insubordination", and "other just cause"
within the meaning of G.L. c. 71, § 42.

(Id.).  McGrath further emphasized that she did not intend to dismiss Meagher based on

the remaining portions of her email, and that she recognized the plaintiff's right to engage

in lawful picketing, attend School Committee meetings, communicate her views to others,

and advocate in support of the doctrine pertaining to the Union's right to strike.  (Id. at 1-

2).  In addition, McGrath stated that her decision was not premised upon "any activities

you have taken to assert your rights under a collective bargaining agreement or to engage

in activities which are protected by G.L. c. 150E, § 10[,]" which pertains to union

activities.  (Id. at 2).

There is no dispute that McGrath did not consult with Sharkey or the ASC before

reaching her decision to terminate Meagher's employment.  (PF ¶ 208).  Moreover, the

parties agree that McGrath never conducted an investigation into the circumstances

surrounding Meagher's email, and had no discussions with anyone at AHS regarding the

use of the "abstain" option on the ballots for the self-study reports.  (Id. ¶¶ 209, 220; DR

¶¶ 209, 220).  According to McGrath, she believed, at the time she sent the notice of

termination to the plaintiff, that Meagher was asking her colleagues to misuse their votes

and to ignore their professional responsibilities by refusing to vote on the merits of the

reports.  (Def. Ex. C at 140-41).

Under Massachusetts law, Meagher was entitled to a hearing prior to any final determination regarding her dismissal. (PF ¶ 218; Def. Ex. F at 2). A hearing took place before McGrath in early September 2012. (PF ¶ 219, 222). Meagher was represented by counsel for the AEA at the hearing, and was given an opportunity to present testimony, as well as oral argument. (Id. ¶ 222). Following the hearing, McGrath made the decision to dismiss Meagher from her job. (Id. ¶ 223; DF ¶ 51). By letter dated September 14, 2012, McGrath informed the plaintiff that she was terminating her employment, effective September 17, 2012, for the same reasons that she had articulated in her June 26, 2012 letter. (PF ¶¶ 227-28, 230). Accordingly, Meagher was terminated, based on the contents of her email, because in McGrath's view, she was asking fellow teachers at the high school to abstain from voting on the merits of the self-study reports. (See Def. Ex. C at 140-41; CERB Decision at 31-32).[5]

### Events Following Meagher's Termination

Following her termination from the Andover School Department, Meagher applied for unemployment benefits. (PF ¶ 245). According to Meagher, the defendants opposed the application on the grounds that the plaintiff had been organizing a strike. (Pl. Ex. 7 at 134). The Department of Unemployment rejected the defendants' position and determined that Meagher was entitled to benefits. (Id. at 134-35). The defendants

---

[5] The Decision of the Commonwealth Employment Relations Board, which was issued in connection with an unfair labor practice charge that was brought on Meagher's behalf, can be found at Docket No. 50-2.

initially appealed the decision, but withdrew the appeal one hour prior to the hearing. (Meagher Aff. ¶ 29). Consequently, Meagher was able to obtain benefits, but only after a three month delay. (PF ¶ 252).

On October 10, 2012, less than a month after Meagher was discharged from her teaching position at AHS, the AEA filed an unfair labor practice charge with the Department of Labor Relations ("DLR"), alleging that the ASC had violated Mass. Gen. Laws ch. 150E[6] by terminating Meagher for engaging in concerted activity. (CERB Decision at 1-2). The ASC denied the charges, and asserted that Meagher's email had advocated an unlawful withholding of essential services, in violation of Mass. Gen. Laws ch. 150E, § 9A. (Id.). While the DLR matter remained pending, Meagher applied for another teaching position. (PF ¶ 232). However, according to the plaintiff, the defendants refused to provide her with a reference letter unless it contained information regarding her dismissal from AHS. (Id. ¶ 231). She further claims that the defendants' refusal to provide her with a neutral reference letter from an active administrator in the Andover School Department resulted in the loss of a specific job opportunity and deprived her of gainful employment.[7] (See Meagher Aff. ¶¶ 34-35).

---

[6] Mass. Gen. Laws ch. 150E "protects the rights of public employees ... to self-organize and to bargain collectively." Mass. State Police Commissioned Officers Ass'n v. Commonwealth, 462 Mass. 219, 224, 967 N.E.2d 626, 631 (2012) (emphasis omitted).

[7] Meagher also contends that while the DLR matter was pending, one of the AEA officers contacted her to convey an offer from the defendants. According to Meagher, the offer consisted of a promise to provide her with a neutral reference letter, but only if Meagher submitted a letter of resignation and thus mooted the unfair labor practice charge. (Meagher Aff. ¶¶ 36-37). In addition, Meagher allegedly was told that if she refused to resign, her termination for

On July 2, 2013, the Commonwealth Employment Relations Board ("CERB" or "Board") issued a written Decision in favor of Meagher with respect to the unfair labor practice charge against the ASC. (See generally CERB Decision). Specifically, the Board found that Meagher had engaged in protected concerted activity when she distributed the email urging her colleagues to vote "abstain" in order to advance the Union's collective bargaining goals. (CERB Decision at 50). It also found that the decision to terminate her employment with the Andover Public Schools was based directly on the plaintiff's protected conduct. (Id. at 50-51). Accordingly, the CERB held that "the Employer discriminated against Meagher based on her union activity" in violation of Massachusetts law. (Id. at 51). Moreover, the CERB issued an order in which it directed the School Committee to reinstate Meagher to her teaching position at AHS and compensate Meagher "for all losses she suffered, if any, as a result of the School Committee's unlawful action[.]" (Id.).

---

"insubordination," "conduct unbecoming a teacher" and "other just cause" would become part of her permanent record at the Department of Elementary and Secondary Education, and would adversely affect her ability to maintain accreditation as a teacher. (Id. ¶ 38). The defendants have challenged this evidence on the grounds that it constitutes inadmissible hearsay, while Meagher contends that it is not being offered for the truth of the matters asserted therein, but rather to show that she felt threatened and intimidated by the defendants' alleged statements. (See DR ¶¶ 237-39; Pl. Opp. Mem. (Docket No. 132) at 25-26). "A statement is not offered for its truth, and therefore is not hearsay, when the purpose of offering the statement is to show its probable effect upon the state of mind of another person who heard the statement." In re Bank of New England Corp., 165 B.R. 972, 974 (Bankr. D. Mass. 1994). However, where, as here, the affiant did not get her information directly from the defendant, but rather obtained it through a third party, "the [c]ourt is being asked to accept the truth of the [third party's] statement[.]" Id. In other words, Meagher is asking the court to accept the truth of the AEA officer's statement as to what the defendants said. See id. Accordingly, the proposed evidence is hearsay, and is not admissible on summary judgment.

Despite the ruling in her favor on the unfair labor practice charge, Meagher has continued to pursue her claims against the defendants in this action. By those claims, Meagher is seeking "to redress violations of her constitutional rights" pursuant to Section 1983 and the MCRA. (Def. Ex. A ¶ 1).

Additional factual details relevant to this court's analysis are described below where appropriate.

## III.  ANALYSIS

### A.  Summary Judgment Standard of Review

Each of the parties has moved for summary judgment with respect to both of the plaintiff's claims. "The role of summary judgment is 'to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" PC Interiors, Ltd. v. J. Tucci Constr. Co., 794 F. Supp. 2d 274, 275 (D. Mass. 2011) (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)) (additional citations omitted). The burden is upon the moving party to show, based upon the discovery and disclosure materials on file, and any affidavits, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'" Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)). "A fact is 'material' only if it possesses the capacity to sway the outcome of the litigation under the applicable law." Id. (quotations, punctuation and citations omitted).

"Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue." PC Interiors, Ltd., 794 F. Supp. 2d at 275. The opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts. LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993). Accordingly, "the nonmoving party 'may not rest upon mere allegation or denials of his pleading[,]'" but must set forth specific facts showing that there is a genuine issue for trial. Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986)). "Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Adria Int'l Group, Inc. v. Ferre Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001). "'When facing cross-motions for summary judgment, a court must rule on each motion independently, deciding in each instance whether the moving party has met its burden under Rule 56.'" Peck v. City of Boston, 750 F. Supp. 2d 308, 312 (D. Mass. 2010) (quoting Dan Barclay, Inc. v. Stewart & Stevenson Servs., Inc., 761 F. Supp. 194, 197-98 (D. Mass. 1991)).

### B. Plaintiff's Motion Pursuant to Fed. R. Civ. P. 56(d)[8]

---

[8] In connection with her opposition to the defendants' motion for summary judgment, the plaintiff has moved for relief pursuant to "Fed. R. Civ. P. 56(f)." (Pl. Opp. Mem. (Docket No. 132) at 29-34). However, it is clear from her opposition brief that her motion is based on Fed. R. Civ. P. 56(d).

The plaintiff argues, as a threshold matter, that the defendants' motion for summary judgment must be denied because the defendants failed to provide adequate and timely responses to her discovery requests. (Pl. Opp. Mem. (Docket No. 132) at 29-34; see also Affidavit of Plaintiff's Attorney (Docket No. 132-4)). Pursuant to Fed. R. Civ. P. 56(d),

> [i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
> (1) defer considering the motion or deny it;
> (2) allow time to obtain affidavits or declarations or to take discovery; or
> (3) issue any other appropriate order.

Meagher contends that denial is warranted in this case because the defendants' refusal to provide her with essential information, and this court's failure to grant her sufficient relief on various motions to compel, have "left [her] crippled with regards to opposing the Defendants' Motion." (Pl. Opp. Mem. at 34).

The plaintiff's motion for relief under Rule 56(d) is denied. As detailed below, the defendants' motion raises legal issues, which require this court to apply the applicable case law to facts that are undisputed in relevant part. Although the plaintiff has submitted an affidavit from her counsel detailing the factual basis for her motion, she has not established that there is any outstanding discovery that has the potential to affect this court's analysis or alter the outcome of the defendants' motion. Therefore, she has failed to show that she "cannot present facts essential to justify [her] opposition" such that she is entitled to relief under Rule 56(d).

### C.    Count I: Section 1983 Claim for Unconstitutional Retaliation

Meagher claims, in Count I of her Second Amended Complaint, that the defen-

dants should be held liable under Section 1983 because they retaliated against her for

exercising her First Amendment right to engage in free speech.  "A claim under section

1983 has two essential elements.  First, the challenged conduct must be attributable to a

person acting under color of state law" and "second, the conduct must have worked a

denial of rights secured by the Constitution or by federal law."  Soto v. Flores, 103 F.3d

1056, 1061 (1st Cir. 1997).  In the instant case, there is no dispute that the defendants

were acting under color of state law at all relevant times.  At issue is whether their

conduct in response to Meagher's June 10, 2012 email violated her constitutional right to

free speech.  For the reasons detailed below, this court finds that this issue must be

resolved in the plaintiff's favor.

### Elements of a Retaliation Claim

"It is well settled that 'as a general matter the First Amendment prohibits govern-

ment officials from subjecting an individual to retaliatory actions . . . for speaking out.'"

Decotiis v. Whittemore, 635 F.3d 22, 29 (1st Cir. 2011) (quoting Mercado-Berrios v.

Cancel-Alegria, 611 F.3d 18, 25-26 (1st Cir. 2010)) (additional citation omitted).  In the

public employment context, however, this right is not unlimited.  As the Supreme Court

explained in Garcetti v. Cellabos, 547 U.S. 410, 418, 126 S. Ct. 1951, 1958, 164 L. Ed.

2d 689 (2006), "[w]hen a citizen enters government service, the citizen by necessity must

accept certain limitations on his or her freedom."  This is because

> [g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services. Public employees, moreover, often occupy trusted positions in society. When they speak out, they can express views that contravene governmental policies or impair the proper performance of governmental functions.

Garcetti, 547 U.S. at 418-19, 126 S. Ct. at 1958 (internal citation omitted). Consequently, "a governmental employer may impose certain restraints on the speech of its employees, restraints that would be unconstitutional if applied to the general public." Davignon v. Hodgson, 524 F.3d 91, 100 (1st Cir. 2008) (quoting City of San Diego v. Roe, 543 U.S. 77, 80, 125 S. Ct. 521, 523, 160 L. Ed. 2d 410 (2004)) (alteration omitted).

In accordance with the guidance set forth by the Supreme Court, including the Court's discussion in Garcetti, the First Circuit has established the following three-part test for determining whether an adverse employment action violates a public employee's right of free speech:

> First, a court must determine "'whether the employee spoke as a citizen on a matter of public concern.'" *Curran v. Cousins*, 509 F.3d 36, 45 (1st Cir. 2007) (quoting *Garcetti*, 547 U.S. at 418, 126 S. Ct. 1951). Second, the court must "balance ... the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 44 (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968)) (omission in original). Third, the employee must "show that the protected expression was a substantial or motivating factor in the adverse employment decision." *Id.* at 45.

Decotiis, 635 F.3d at 29.  In the event all three elements of the test "are resolved in favor of the plaintiff, the employer may still escape liability if it can show that 'it would have reached the same decision even absent the protected conduct.'"  Id. at 29-30 (quoting Rodriguez-Garcia v. Miranda-Marin, 610 F.3d 756, 765-66 (1st Cir. 2010)).

In the instant case, the defendants do not dispute that Meagher was terminated from her teaching position based upon the content of her June 10, 2012 email.  Nor do they contend that she would have been dismissed if she had not written the offending communication.  Consequently, the First Amendment claims in this matter turn on whether or not Meagher was speaking as a citizen on a matter of public concern when she distributed the email to other members of the AEA, and whether or not her interests in doing so outweighed the interests of the defendants.  Both of these questions present issues of law that must be resolved by the court.  Curran, 509 F.3d at 45 ("it is the judge who decides as a matter of law the issues in the [first] two steps").

### The Nature of Meagher's Speech

The first issue that the court must consider is whether Meagher was speaking as a citizen on a matter of public concern at the time she wrote the email to her colleagues. The defendants argue that Meagher was not speaking as a citizen, but as an employee of the Andover School Department, and that her communication is not entitled to protection under the Constitution because she was speaking pursuant to her official job responsibilities as a teacher at AHS.  (Def. Mem. (Docket No. 123) at  11-16).  "In *Garcetti*, the Supreme Court held that public employees do not speak as citizens when they 'make

statements pursuant to their official duties,' and that accordingly, such speech is not protected by the First Amendment." Decotiis, 635 F.3d at 30 (quoting Garcetti, 547 U.S. at 421, 126 S. Ct. at 1960). However, the Supreme Court has since clarified that the mere fact that an individual's speech "relates to public employment" or "concerns information acquired by virtue of [her] public employment does not transform that speech into employee – rather than citizen – speech." Lane v. Franks, 134 S. Ct. 2369, 2379, 189 L. Ed. 2d 312 (2014). Instead, as the Court explained, "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." Id.

In order to determine whether Meagher's speech was made pursuant to her ordinary responsibilities as an English teacher, this court "must take a hard look at the context of the speech." Decotiis, 635 F.3d at 32. Although the First Circuit has emphasized that "no one contextual factor is dispositive," it has set forth a list of non-exclusive factors to guide courts in their evaluation. Id. Those factors include:

> whether the employee was commissioned or paid to make the speech in question; the subject matter of the speech; whether the speech was made up the chain of command; whether the employee spoke at her place of employment; whether the speech gave objective observers the impression that the employee represented the employer when she spoke (lending it "official significance"); whether the employee's speech derived from special knowledge obtained during the course of her employment; and whether there is a so-called citizen analogue to the speech.

Id. (internal citations omitted). Ultimately, however, "the proper inquiry is practical rather than formal, focusing on the duties an employee actually is expected to perform,

and not merely those formally listed in the employee's job description." Id. at 31 (quotations and citations omitted).

The record on summary judgment establishes that Meagher was speaking as a citizen, and not an employee of the Andover School Department, when she distributed the June 10, 2012 email at issue in this case. There is no dispute that Meagher wrote the email on her personal, home computer, and distributed it to her colleagues using her personal email account. (PF ¶ 170; DF ¶ 33). Moreover, there is no dispute that she sent the communication during non-working hours, that she contacted the recipients using their personal email accounts, and that the email concerned issues that were addressed in the press and triggered considerable discussion among members of the local community. (See PF ¶¶ 34, 170; Meagher Aff. ¶ 8). The substance of the email, in which Meagher advocated use of the "abstain" option on the ballots for the self-study reports as a means of delaying the NEASC re-accreditation process and gaining leverage in the contract dispute between the Union and the ASC, would not have given objective observers the impression that Meagher was representing her employer when she communicated with her colleagues. (See Def. Ex. E). On the contrary, the communication constituted a deliberate attempt to undermine the interests of the defendants and rally Union supporters against the School Committee's efforts to change the high school schedule. Accordingly, the record demonstrates that Meagher was working in her capacity as a Union activist

rather than in her capacity as a high school English teacher, when she distributed the communication in question.[9]

There is no question that Meagher's email was related to her employment as a teacher at AHS because it concerned voting on the self-study reports that were part of the high school re-accreditation process, and because it sought to encourage action that might impact the terms of her employment. There is also no question that Meagher would have obtained knowledge of these matters as a result of her role as a teacher at AHS. In fact, the defendants have presented evidence indicating that the high school teaching staff was required to participate in the NEASC re-accreditation process as part of their ordinary job responsibilities. (See DF ¶ 18; Def. Ex. C at 43-44). Nevertheless, the record belies any conclusion that the communication at issue fell within the scope of Meagher's ordinary duties as an English teacher. Indeed, it is undisputed that Meagher was accused of engaging in "conduct unbecoming a teacher" and "insubordination," and was ultimately dismissed from her job as an Andover public school teacher, based on the substance of that communication. (See Def. Ex. F; PF ¶¶ 227-28, 230). Accordingly, this court

---

[9] The defendants suggest that Meagher's email cannot constitute protected speech because it was written pursuant to her professional responsibilities as an "activist union member." (Def. Mem. at 13). However, the record establishes that Meagher was employed by the defendants as a teacher in the English Department at AHS, and there is no evidence to suggest that Meagher's participation in the AEA had anything to do with her ordinary responsibilities as a teacher in the Andover public school system. In particular, the defendants have not identified any evidence showing that Meagher's duties as an English teacher required her to become an active member in the Union or otherwise engage in collective action. In addition, they have not pointed to any facts showing that Meagher was expected to communicate with her colleagues about issues of importance to the AEA as part of her duties as a teacher.

concludes that she was speaking as a citizen rather than an employee at the time she engaged in the relevant speech.  See Dahlia v. Rodriguez, 735 F.3d 1060, 1075 (9th Cir. 2013) ("the fact that an employee is threatened ... by his superiors for engaging in a particular type of speech provides strong evidence that the act of speech was not, as a 'practical' matter, within the employee's job duties").

The defendants' reliance on the Second Circuit's decision in Weintraub v. Bd. of Educ. of City Sch. Dist. of City of N.Y., 593 F.3d 196 (2d Cir. 2010), does not alter this court's conclusion.  In that case, the court held that a school teacher's formal grievance challenging the administration's refusal to discipline a student was not protected by the First Amendment because "it was part-and-parcel of his concerns about his ability to properly execute his duties as a public school teacher – namely, to maintain classroom discipline, which is an indispensable prerequisite to effective teaching and classroom learning."  Weintraub, 593 F.3d at 203 (internal quotations, citations and punctuation omitted).  Significantly, the court found that the plaintiff's speech "was a means to fulfill, and undertaken in the course of performing, his primary employment responsibility of teaching" and was thus filed "in furtherance of the execution of one of [his] core duties" as a teacher.  Id. (internal quotations and citation omitted).  It also determined that "[t]he lodging of a union grievance is not a form or channel of discourse available to non-employee citizens, as would be a letter to the editor or a complaint to an elected representative or inspector general[,]" and that the plaintiff made his speech "pursuant to an existing dispute-resolution policy established by his employer[.]"  Id. at 204.  According-

ly, the court found that the plaintiff's filing of a grievance "lacked a relevant analogue to citizen speech[,]" which while "not dispositive[,]" provided further support for its conclusion that the speech was not protected.  Id.

The circumstances surrounding Meagher's speech in this case are easily distinguished from the circumstances presented in Weintraub.  Here, it cannot be said that an effort to hold up the re-accreditation process in order to gain leverage in the CBA negotiations was a means to fulfill her responsibilities as an English teacher or was undertaken in the course of carrying out those duties.  As the CERB determined in its Decision on the unfair labor practice charge, the record in this case establishes that the purpose of Meagher's email was to advance the Union's collective bargaining goals in its dispute with the ASC.  (CERB Decision at 50).  Therefore, it constituted protected union activity.  (Id.).  Moreover, Meagher's distribution of an email from her home computer to the personal accounts of others did not involve the use of any school-related resources or systems.  Unlike the grievance procedure employed by the plaintiff in Weintraub, which is designed to bring employment-related matters to superiors up the chain of command, the internet is available to all individuals who have a computer, and may be used by ordinary citizens as a means of organizing around a cause.  Accordingly, this case does not present a situation where "there is no relevant analogue to speech by citizens who are not government employees."  Weintraub, 593 F.3d at 203 (quoting Garcetti, 547 U.S. at 424, 126 S. Ct. at 1961).  See also Garcetti, 547 U.S. at 423, 126 S. Ct. at 1961 (explaining that activities such as "writing a letter to a local newspaper" or "discussing

politics with a co-worker" are entitled to protection because they are "the kind of activit[ies] engaged in by citizens who do not work for the government").

The defendants argue that Meagher's email was written pursuant to her official duties because it was part-and-parcel of her concerns about her ability to teach effectively if the teacher course load were increased.  (See Def. Mem. at 15).  It certainly is possible to view Meagher's speech as a means to insure that she could continue to fulfill her duties as a teacher, particularly in light of evidence that the proposed change to the teaching schedule would enable the defendants to cut 20 percent of the high school teaching staff, and potentially reduce teacher planning time while increasing workload and class size. (See DF ¶ 5; PF ¶¶ 30, 33).  Nevertheless, "*Weintraub's* use of the terms 'part-and-parcel,' 'core duties,' and 'indispensable prerequisite' suggests a focus upon speech that is a standard part of the employee's job activities, such that it is fair to say that the employer would reasonably expect the expression and is therefore entitled to exercise control over its form and content."  Hagan v. City of N.Y., 39 F. Supp. 3d 481, 511 (S.D.N.Y. 2014).  Here, the challenged discourse was made outside of the school, and was neither required nor expected of Meagher in her capacity as a member of the high school faculty.  There is no evidence that Meagher's communication fell within the scope of her ordinary duties as a teacher.  Consequently, this court finds that Meagher's email constituted speech as a citizen.

**Public Concern**

The defendants have not disputed Meagher's assertion that her communication involved a matter of public concern. This court finds that the record on summary judgment supports Meagher's position.

"Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." Lane, 134 S. Ct. at 2380 (quotations and citation omitted). In the instant case, the record establishes that the dispute between the Union and the ASC was the subject of considerable discussion in the local community and the topic of coverage in the local media. (PF ¶ 34; Meagher Aff. ¶ 8). It also shows that the local newspaper obtained information regarding Meagher's email, and published an article describing its contents. (PF ¶¶ 183-84). Accordingly, there is no dispute that the plaintiff's speech not only touched upon newsworthy events, but was also itself a topic of public interest.

The fact that Meagher's speech related to union matters provides further support for a conclusion that it involved a matter of public concern. While the First Circuit has declined to endorse the notion that such speech, by its nature, "touch[es] on a matter of 'inherent public concern[,]'" it has found that union-related speech "does point in the direction of finding that the speech involved a matter of public concern." Davignon, 524 F.3d at 101. Here, the record shows that Meagher's speech was aimed at rallying 60 other teachers behind the Union's fight against a policy that would impact all teachers at the high school. This evidence too supports the conclusion that the speech in question

involved a matter of public concern.  See id. at 102 (finding that plaintiff's union-related speech involved a matter of public concern where one of its purposes "was to allow union members to publicly express criticism of management"); Gregorich v. Lund, 54 F.3d 410, 416 (7th Cir. 1995) (finding that plaintiff's union-organizing effort involved a matter of public concern where it aimed to effectuate a change in employer policy that would benefit plaintiff and his co-workers); Justice v. Danberg, 571 F. Supp. 2d 602, 610-11 (D. Del. 2008) (finding that "collective bargaining and contract negotiations concerning working conditions of correctional officers in the state prison system is of considerable concern to the community").

## Balancing of Interests

The defendants argue that even if Meagher was speaking as a citizen on a matter of public concern, they are entitled to summary judgment on her First Amendment claims because they had an adequate justification for dismissing her from employment.  (Def. Mem. at 17-19).  A public employee's speech "is not categorically entitled to First Amendment protection simply because it is speech as a citizen on a matter of public concern."  Lane, 134 S. Ct. at 2380.  Under the Supreme Court's decision in Pickering v. Bd. of Educ., 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968), the court must determine "whether the government had 'an adequate justification for treating the employee differently from any other member of the public' based on the government's needs as an employer."  Id. (quoting Garcetti, 547 U.S. at 418, 126 S. Ct. at 1958). Accordingly, this court must balance "the value of [Meagher's] speech . . . against the

employer's legitimate government interest in preventing unnecessary disruptions and inefficiencies in carrying out its public service mission." <u>Davignon</u>, 524 F.3d at 103 (quotations and citations omitted).

In evaluating whether the defendants had an adequate justification for terminating Meagher's employment, this court may consider a number of factors, including "(1) the time, place, and manner of [the plaintiff's] speech (noting that speech will likely be more disruptive if it occurs during work hours, at the office, or requires the speaker or others to leave work stations), and (2) the employer's motivation in making the adverse employment decision." <u>Id.</u> at 104. Ultimately, however, the court's analysis "is highly fact specific." <u>Id.</u> Therefore, it is necessary to take "a hard look at the facts of the case, including the nature of the employment and the context in which the employee spoke." <u>Decotiis</u>, 635 F.3d at 35.

This court finds, based on the circumstances presented in the instant case, that Meagher's speech outweighed any interest that the defendants had in preventing unnecessary disruptions and inefficiencies in the workplace. As an initial matter, there is no dispute that Meagher's communication with her colleagues occurred during non-working hours, and was accomplished using private rather than public computers and email addresses. Moreover, there is no dispute that it was appropriate for the teachers to select the "abstain" option on the ballots of the NEASC self-study reports, and that the option had been added in order to determine the extent to which teachers were using the NEASC process to register their displeasure with the CBA negotiations. (<u>See</u> Def. Ex. D at 23;

DF ¶ 27; PR ¶ 27; PF ¶ 129).  In fact, the record demonstrates that the "abstain" alternative was developed with the knowledge and approval of the high school administration.  (PF ¶¶ 9, 118; DR ¶ 118).  Therefore, it should not have come as a surprise to the defendants that Meagher or other active members of the AEA would use that option, or would encourage other members of the AHS teaching staff to use that option, for the purpose of bolstering the Union's position in the contract negotiations.

The record also establishes that Meagher's email had little if any adverse impact on the NEASC re-accreditation process.  In particular, the record shows that on June 20, 2012, ten days after Meagher distributed her email, the Union and the ASC reached a final agreement on the terms of a new CBA.  (DF ¶ 49).  On June 21, 2012, the faculty at AHS voted to approve all of the outstanding self-study reports.  (DF ¶ 50).  There is no evidence that any faculty members refused to participate in the voting process.  Further-more, while the record shows that some faculty members voted "no," and some voted "abstain," there is no dispute that each of the reports was approved by a two-thirds majority of the teaching staff, as required for approval under the NEASC procedures. (See id.; PF ¶ 195).  Consequently, any potential threat that Meagher's speech posed to the re-accreditation process was extinguished before June 26, 2012, when McGrath notified the plaintiff of her intent to dismiss her from her job.  (See Def. Ex. F).  Certain-ly by the time McGrath made the final decision to terminate Meagher in September 2012, any opportunity that Meagher may have had to halt the NEASC process or disrupt the workplace had long since passed.

Based on the undisputed facts presented in this case, this court concludes that the defendants have not demonstrated "an adequate justification" for the decision to terminate Meagher's employment. See Garcetti, 547 U.S. at 418, 126 S. Ct. at 1958. Accordingly, the plaintiff has established that she suffered retaliation for protected speech in violation of her rights under the First Amendment.

## Qualified Immunity

The defendants contend that even if the plaintiff's constitutional rights were violated, McGrath is entitled to protection under the doctrine of qualified immunity. (Def. Mem. at 19-20). "Qualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.'" Lane, 134 S. Ct. at 2381 (quoting Ashcroft v. al-Kidd, 563 U.S. __, __, 131 S. Ct. 2074, 2085, 179 L. Ed.2d 1149 (2011)). Thus, "[u]nder this doctrine, courts may not award damages against a government official in his personal capacity unless 'the official violated a statutory or constitutional right,' and the 'right was clearly established at the time of the challenged conduct.'" Id. (quoting al-Kidd, 563 U.S. at __, 131 S. Ct. at 2080) (internal quotations omitted). Although this court finds that McGrath deprived Meagher of her right of free speech, it concludes that the contours of this right were not clearly established at the time of Meagher's termination. Therefore, McGrath is immune from liability under the doctrine of qualified immunity.

In order to determine whether a right was clearly established, the court must consider two questions: "first, whether the 'the contours of the right [were] sufficiently

clear that a reasonable official would understand that what he is doing violates that right,'

and second, 'whether in the specific context of the case, a reasonable defendant would

have understood that his conduct violated the plaintiffs' constitutional rights.'" Decotiis,

635 F.3d at 36 (quoting Mosher v. Nelson, 589 F.3d 488, 493 (1st Cir. 2009)) (additional

quotations omitted).  Therefore, "[t]he salient question is whether the state of the law at

the time gave a defendant 'clear notice that what he was doing was unconstitutional.'"[10]

Diaz-Bigio v. Santini, 652 F.3d 45, 50 (1st Cir. 2011) (quoting Decotiis, 635 F.3d at 37)

(additional citation omitted).

The First Circuit has emphasized that

> "[i]mmunity exists even where the abstract 'right' invoked by the
> plaintiff is well-established, so long as the official could reasonably
> have believed 'on the facts' that no violation existed." *Dirrane v.*
> *Brookline Police Dep't*, 315 F.3d 65, 69 (1st Cir. 2002).  Although
> the Supreme Court has made clear that municipal officers can "be on
> notice that their conduct violates established law even in novel
> factual circumstances," *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct.
> 2508, 153 L.Ed. 2d 666 (2002), it has also stressed that qualified
> immunity "protects 'all but the plainly incompetent or those who
> knowingly violate the law,'" *al-Kidd*, 131 S.Ct. at 2085 (quoting
> *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d
> 271 (1986)).

---

[10]  The plaintiff insists that Meagher's rights were "clearly established" because, as a
factual matter, the use of the "abstain" option on the ballots for the self-study reports was entirely
acceptable, and McGrath would have known this if she had conducted any investigation into the
circumstances leading up to the creation of the offending email.  (See Pl. Mem. (Docket No. 116-
2) at 32-35).  The plaintiff's argument misreads the relevant standard.  For purposes of the
qualified immunity analysis, the question is whether the parameters of the constitutional right at
issue were sufficiently clear under the relevant case law to put McGrath on notice that her
decision to dismiss Meagher from employment, under the circumstances presented, deprived the
plaintiff of that right.

Id.  It has further instructed that "[a] right is clearly established and immunity will not issue only if '*every* reasonable official would have understood that what he is doing violates that right.'"  Id. at 50-51 (quoting al-Kidd, 131 S. Ct. at 2083) (additional quotations and citation omitted).  Therefore, if public officials "'of reasonable competence could disagree' on the lawfulness of the action, they are entitled to immunity."  Id. (quoting Malley, 475 U.S. at 341, 106 S. Ct. at 1096).

This court finds that a reasonably competent official in McGrath's position could have believed that she was not violating the First Amendment by terminating Meagher under the circumstances of this case.  As an initial matter, there is no dispute that McGrath obtained the advice of counsel before she decided to terminate the plaintiff's employment.  (See DF ¶ 42; PR ¶ 42).  More importantly, at the time of the termination in 2012, the Supreme Court had not had occasion to clarify "the scope of a public employee's employment duties and what it means to speak pursuant to those duties" following its decision in Garcetti.  Decotiis, 635 F.3d at 37.  As evidenced by the differing interpretations given by the plaintiff and defendants in this case to the post-Garcetti decisions, the parameters of the First Amendment privilege remained murky.  (Compare Pl. Mem. at 21-23 with Def. Mem. at 11-16).  It was not until 2014, when the Supreme Court decided Lane, that the Court explained that "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee – rather than citizen – speech[,]" and that the "critical question" for purposes of the First Amendment analysis "is whether the speech at

issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." Lane, 134 S. Ct. at 2379. Moreover, both before and after Lane, as the First Circuit has emphasized, each case must turn on the specific factual context in which the speech at issue was made. See Decotiis, 635 F.3d at 32 ("To determine whether . . . speech was made pursuant to official responsibilities, the Court must take a hard look at the context of the speech" and "no one contextual factor is dispositive" of the question whether "speech was made pursuant to official responsibilities"). Therefore, "the contours of the [First Amendment] right were still cloudy" and not clearly established at the time of the events in question in this case. Id. at 37.

Even if this court were to assume that no reasonable official could have believed that Meagher was speaking pursuant to her official duties as a teacher, McGrath would still be entitled to qualified immunity because the outcome of the balancing of interests in this case, as required by the Supreme Court in Pickering, "was not so clear as to put all reasonable officials on notice that firing [Meagher] would violate the [Constitution]." Diaz-Bigio, 652 F.3d at 52. As the First Circuit has cautioned, "[b]ecause Pickering's constitutional rule turns upon a fact-intensive balancing test, it can rarely be considered clearly established for qualified immunity purposes." Id. at 53 (quotations and citations omitted). Consequently, it is "only in the extraordinary case" that qualified immunity will not apply. Id. This is not such a case.

Although this court has found that Meagher's speech did not cause a delay in the re-accreditation process, it was not unreasonable for McGrath to view the plaintiff's

conduct as a continuing threat to the efficient operation of AHS. See id. at 53-54

("substantial weight has been given to government employers' reasonable predictions of

disruption" (quotations and citations omitted)). In addition, McGrath could have reason-

ably concluded that the administration no longer had "the necessary confidence and trust

in [Meagher] to maintain her employment going forward." Id. at 54. While Meagher

may have done nothing wrong by advocating for the use of the "abstain" option, McGrath

could have reasonably viewed Meagher's willingness to put the school's reputation on the

line in order to maintain a five-course schedule as damaging to the community's

confidence in the School Department and the interests of the town in general.

Accordingly, this court finds that McGrath could have reasonably determined that

Meagher's actions were disruptive to the operation of the school system, and "could have

reasonably concluded that firing [the plaintiff] would not violate her First Amendment

rights." Id. at 55. Therefore, McGrath is entitled to qualified immunity.

## Municipal Liability

The defendants next assert that the plaintiff cannot maintain a claim against the

municipal entities, the ASC and the Andover School Department, because she has failed

to present evidence showing that McGrath was acting pursuant to an official custom,

policy or practice when she terminated Meagher's employment, and because she has

failed to show that the School Committee condoned or participated in the Superinten-

dent's decision to dismiss the plaintiff. (Def. Mem. at 20-21). This court finds that the

municipal defendants are liable because McGrath was the ultimate decision-maker

vis-à-vis the decision to terminate Meagher's employment. Therefore, Meagher is entitled to judgment as a matter of law on her claims against those defendants.

It has long been established that "[m]unicipalities cannot be held liable for the constitutional violations of municipal employees pursuant to the doctrine of *respondeat superior*." Welch v. Ciampa, 542 F.3d 927, 941 (1st Cir. 2008) (citing Monell v. Dep't of Social Servs., 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed.2d 611 (1978)). Thus, "[u]nder § 1983, municipalities can be liable for constitutional violations only if the violation occurs pursuant to an official policy or custom." Id. In the instant case, Meagher argues that the municipal defendants should be held liable for McGrath's unconstitutional conduct because McGrath had final decision-making authority over the hiring and firing of personnel who worked for the School Department. (See Docket No. 146). This court finds that Meagher's argument is supported by the relevant authority.

"A plaintiff can establish the existence of an official policy by showing that the alleged constitutional injury was caused . . . by a person with final policymaking authority." Welch, 542 F.3d at 941. This is because a decision made by a government official with such authority "'represents an act of official government policy' as that term is properly understood." Putnam v. Town of Saugus, Mass., 365 F. Supp. 2d 151, 179 (D. Mass. 2005) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481, 106 S. Ct. 1292, 1299, 89 L. Ed.2d 452 (1986)) (additional quotations omitted). Therefore, while "liability may not be imposed on a municipality for a single instance of misconduct by an official lacking final policymaking authority," liability does attach under § 1983 "'where

-45-

the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.'" Welch, 542 F.3d at 942 (quoting Pembaur, 475 U.S. at 481, 106 S. Ct. 1292).

In order to determine whether McGrath had "final policymaking authority" with respect to Meagher's termination, it is necessary to look to state and local law. See Putnam, 365 F. Supp. 2d at 183 ("The existence of final policymaking authority is . . . [a] matter of state and local law"). Under the Massachusetts Education Reform Act of 1993, "the ultimate responsibility" for hiring, firing and demoting public school teachers "resides . . . with the superintendents themselves[.]" Ciccarelli v. Sch. Dep't of Lowell, 70 Mass. App. Ct. 787, 792, 877 N.E.2d 609, 615 (2007). See also Mass. Gen. Laws ch. 71, § 42 ("A principal may dismiss or demote any teacher or other person assigned full-time to the school, *subject to the review and approval of the superintendent*" (emphasis added)); Mass. Gen. Laws ch. 71, § 59B ("Principals employed under this section shall be responsible, consistent with district personnel policies and budgetary restrictions *and subject to the approval of the superintendent*, for hiring all teachers" (emphasis added)). Accordingly, McGrath was the final decisionmaker with respect to Meagher's dismissal, and the municipal defendants are liable for the violation of Meagher's constitutional rights.

### D.    Count II: Claim for Violation of the MCRA

In Count II of her Second Amended Complaint, Meagher is seeking to hold the defendants liable under the MCRA. "The qualified immunity principles developed under

§ 1983 apply equally to claims under the MCRA." Howcroft v. City of Peabody, 51 Mass. App. Ct. 573, 595, 747 N.E.2d 729, 746 (2001). See also Duarte v. Healy, 405 Mass. 43, 46, 537 N.E.2d 1230, 1232 (1989) ("We conclude it to be consistent with the intent of the Legislature in enacting the [MCRA] to adopt thereunder the standard of immunity for public officials developed under § 1983"). Therefore, McGrath is immune from liability on Count II of Meagher's complaint. With respect to the plaintiff's MCRA claims against the ASC and the Andover School Department, those claims too are not actionable. There is no dispute that those defendants are municipal entities, and "under Massachusetts law a municipality cannot be sued under the MCRA." Kelley v. LaForce, 288 F.3d 1, 11 n.9 (2002) (citing Howcroft, 51 Mass. App. Ct. at 591-92, 747 N.E.2d at 744 ("we conclude that a municipality is not a 'person' covered by the Massachusetts Civil rights Act (MCRA), G.L. c. 12, §§ 11H, 11I")). Accordingly, all of the defendants are entitled to summary judgment with respect to Meagher's state law claim.

In her Reply in support of her motion for summary judgment, the plaintiff insists that the Appeals Court's decision in Howcroft was wrongly decided because it ignored the guidance of the Supreme Judicial Court ("SJC") in Duarte. Specifically, Meagher argues that in Duarte, "the SJC said that the M.C.R.A. parallels 42 U.S.C. § 1983 in all but two respects. Only the former requires a showing of coercion, threats or intimidation, and only the latter requires state action." (Pl. Reply Mem. (Docket No. 134) at 17). Accordingly, Meagher requests that this court certify a question to the SJC so that it can clarify whether municipalities may be subject to liability under both statutes or whether

the MCRA excludes municipalities from its reach.  (See id.).  For the reasons that follow, the plaintiff's request for certification is denied.

Pursuant to SJC Rule 1:03, a federal court may certify a question to the State's highest court where a case involves questions of state law "which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of [the SJC]."  Easthampton Sav. Bank v. City of Springfield, 736 F.3d 46, 50 (1st Cir. 2013) (quoting Mass. S.J.C. R. 1:03).  An issue of state law is determinative if a decision on that issue will provide one of the parties with "the full measure of relief [it] seek[s]."  Id.  A lack of controlling precedent will be found where "a case 'presents a close and difficult legal issue'" such that "[t]he course that the state court would take is not reasonably clear[.]"  Id. at 51 (quoting In re Engage, Inc., 544 F.3d 50, 53 (1st Cir. 2008)).  Even if the issue raised by the plaintiff were dispositive in this case, the question of municipal liability under the MCRA does not present a close and difficult issue of law.

As described above, in Howcroft, the Massachusetts Appeals Court has determined that a municipality is not a "person" for purposes of the MCRA, and the First Circuit has relied on that ruling in dismissing an MCRA claim against a municipality.  See Kelley, 288 F.3d at 11 n.9.  More than a decade has passed since Howcroft was decided, and the SJC has never directly contradicted this ruling.  Moreover, and notwithstanding the plaintiff's argument to the contrary, there is nothing in the SJC's decision in Duarte that compels the conclusion that Howcroft was wrongly decided.  The issue

before the SJC in Duarte was whether public officials who had been sued in their

individual capacities under the MCRA were entitled to qualified immunity.  See Duarte,

405 Mass. at 44, 537 N.E.2d at 1230 ("The issue in this case is whether the defendants,

public officials of the city of Cambridge, are entitled to qualified immunity from suit on

claims against them under G.L. c. 12, §§ 11H & 11I").  The court did not consider

whether a municipality could be held liable under the MCRA, and had no reason to

address that issue.  The SJC did note that in a prior case it had found "that 'the Legis-

lature intended to provide a remedy under G.L. c. 12, § 11I, coextensive with 42 U.S.C.

§ 1983 . . . except that the Federal statute requires State action whereas its State counter-

part does not.'"  Id. at 46-47, 537 N.E.2d at 1232 (quoting Batchelder v. Allied Stores

Corp., 393 Mass 819, 822-23, 473 N.E.2d 1128, 1131 (1985)).  However, this was not

part of the court's holding.  Moreover, the SJC clearly did not intend this to be a compre-

hensive analysis of the differences between the two statutes, as evidenced by the fact that

the SJC did not even mention that under the MCRA, but not Section 1983, a plaintiff

must identify a federal or state right that has been "interfered with by threats, intimida-

tion, or coercion."  See Flesner v. Technical Commc'ns Corp., 410 Mass. 805, 818, 575

N.E.2d 1107, 1115 (1991).  Therefore, Duarte does nothing to support the plaintiff's

assertion that the issue of municipal liability under the MCRA "presents a close and

difficult legal issue" that supports certification.  See Easthampton Sav. Bank, 736 F.3d at

51 (quoting In re Engage, Inc., 544 F.3d at 53).

The plaintiff's reliance on a recent decision by the SJC in <u>Fernandes v. Attleboro</u>, 470 Mass. 117, 20 N.E.3d 229 (2014), does not suggest otherwise.  (<u>See</u> Docket No. 144).  In that case, the issue before the court was whether "the Superior Court lacked subject matter jurisdiction over [the plaintiff's] wage and retaliation claims because, as a housing authority employee, [he] was required to bring such claims before the Civil Service Commission . . . for resolution."  <u>Fernandes</u>, 470 Mass. at 118, 20 N.E.3d at 232.  The case had nothing to do with the MCRA or the issue of municipal liability.

Finally, the plaintiff has failed to provide any basis for questioning the soundness of the <u>Howcroft</u> court's analysis.  In that case, the Appeals Court acknowledged that "a municipality may be liable as a 'person' under § 1983[.]"  <u>Howcroft</u>, 51 Mass. App. Ct. at 592, 747 N.E.2d at 744.  However, it noted that this conclusion was reached only by reviewing the relevant legislative history, which "has no bearing on the MCRA."  <u>Id.</u>  The court further reasoned:

> What is important is that G.L. c. 4, § 7, Twenty-third, only defines person to include "corporations, societies, associations and partnerships."  By the terms of G.L. c. 4, § 7, its definitions govern the construction of statutes unless a contrary intention clearly appears, and here there is no indication in the MCRA that the word "person" includes either the Commonwealth or any of its political subdivisions.

<u>Id.</u> and cases cited.  Thus, the court relied on ordinary rules of statutory construction to conclude that the MCRA does not reach municipalities.  It is reasonably clear that the SJC would come to the same conclusion fourteen years later.  Therefore, certification is not warranted.

# IV. CONCLUSION

For all of the reasons detailed herein, both the "Plaintiff's Motion for Entry of Order Granting Her Partial Summary Judgment as it Relates to Defendants' Liability" (Docket No. 116) and the "Defendants' Motion for Summary Judgment" (Docket No. 122) are ALLOWED IN PART and DENIED IN PART as follows:

1.      In accordance with this Memorandum of Decision, this court holds that the Andover School Committee, the Andover School Department and Marinel McGrath violated Meagher's rights under the First Amendment by terminating her from employment in retaliation for protected speech.

2.      In accordance with this Memorandum of Decision, this court holds that the plaintiff's motion for summary judgment on her claims against the Andover School Committee and the Andover School Department under 42 U.S.C. § 1983 (Count I) is allowed.

3.      In accordance with this Memorandum of Decision, this court holds that Marinel McGrath is entitled to qualified immunity with respect to Meagher's claim under 42 U.S.C. § 1983 (Count I).

4.      In accordance with this Memorandum of Decision, this court holds that the defendants are entitled to summary judgment with respect to Meagher's claims against them under the MCRA, as Marinel McGrath is entitled to qualified immunity and the plaintiff's claims against the municipal defendants are not actionable.

5.      A status conference will take place on **April 21, 2015 at 10:00 a.m.** in Courtroom #15 on the 5th floor.  At that time, the parties shall be prepared to discuss dates for a trial on the issue of damages.

        / s / Judith Gail Dein
Judith Gail Dein
U.S. Magistrate Judge